UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TOP NOTCH SOLUTIONS, INC. and ROBERT RASHIDI,<br><br>                  Plaintiffs,<br>   v.<br><br>CROUSE AND ASSOCIATES INSURANCE BROKERS, INC. et al.,<br><br>              Defendants. | CASE NO. C17-0827JLR-MAT<br><br>ORDER ON MCGRIFF, SEIBELS & WILLIAMS, INC.'S MOTION TO EXCLUDE |

## I.  INTRODUCTION

Before the court is Defendant McGriff, Seibels & Williams, Inc.'s ("MSW") motion to exclude Plaintiffs Top Notch Solutions, Inc.'s ("Top Notch") and Robert Rashidi's (collectively, "Plaintiffs") expert witnesses.  (*See* Mot. (Dkt. # 178).)  Plaintiffs

//

filed a response. (Resp. (Dkt. # 195).[1]) MSW filed a reply. (Reply (Dkt. # 199).) The court has reviewed the motion, the parties' submissions concerning the motion, the relevant portions of the record, and the applicable law. Being fully advised, the court GRANTS in part and DENIES in part MSW's motion.[2] Specifically, the court grants the motion to exclude Dr. Bradford, and denies the motion to exclude Dr. DeKay.

## II. BACKGROUND

Mr. Rashidi marketed commercial automobile liability insurance policies to taxicab businesses and other for-hire drivers operating in King County, Washington through his company, Top Notch. (*See* FAC (Dkt. # 90) ¶ 3.2.2.) Top Notch and Crouse entered into a brokerage agreement in 2010. (*See* Moore Decl. (Dkt. # 8) ¶ 3, Ex. 1 ("Brokerage Agreement").) Pursuant to the Brokerage Agreement, Crouse obtained insurance plans from nonparty insurance carriers for Top Notch's clients. (*See id.* at 2.[3]) In 2013, MSW, a Top Notch competitor, contracted with Crouse "to develop a new underwriting model for the procurement of insurance for associations like the [Western Washington Taxicab Operators Association ('WWTCOA')]," a voluntary advocacy

---

[1] MSW originally styled its motion to exclude as a motion *in limine*. (*See id.* at 1.) The court ruled at a hearing that it would treat the motion as a four-week motion and accept Plaintiffs' response as timely filed. (*See* Dkt. # 201.)

[2] Defendant Crouse and Associates Insurance Brokers, Inc. ("Crouse") joined MSW's motion. (*See* Mot. at 1.) Plaintiffs and Crouse settled, and Crouse was dismissed from this case on September 12, 2019. (*See* Stip. Order for Dismissal (Dkt. # 214).) For purposes of clarity the court refers to MSW alone as the moving party throughout this order. Defendant Law Offices of Pucin & Freidland, PC ("Pucin") did not join the motion to exclude. (*See* Mot. at 1.)

[3] The court cites to the page numbers provided by the court's electronic filing system for all documents in the record except for deposition transcripts, for which the court cites to the page and line numbers provided on the transcripts.

group comprised of taxicab and for-hire drivers.  (*See* McGinnis Decl. (Dkt. # 155) ¶ 6; 1st Bedard Decl. (Dkt. # 156) ¶ 3, Ex. A ("WWTCOA Dep.") at 18:11-20:8; Brucker Decl. (Dkt. # 161) ¶ 2, Ex. 1 ("MSW Program Communications") at 9.)

Plaintiffs contend that Crouse and MSW intended for their arrangement to divert business away from Top Notch and other local brokers (*see* FAC ¶¶ 3.3.3, & 3.3.7), and to establish a monopoly (*see id.* ¶¶ 3.3.21, 3.4.5, 3.4.18).  Plaintiffs further contend that Defendant MSW harmed Plaintiffs' reputation through statements in a WWTCOA newsletter and other negative communications to Top Notch clients.  (*See id.* ¶ 4.3.3; MSW MSJ Resp. (Dkt. # 160) at 11-13; 1st Bedard Decl. ¶ 18, Ex. O ("Fare Times Newsletter").)  Plaintiffs allege that Defendant Pucin is an unlicensed collection agency that unlawfully attempted to collect Top Notch's debts to Crouse and that Pucin's collection efforts caused Humble & Davenport, Mr. Rashidi's subsequent employer, to terminate him.  (*See* FAC ¶¶ 3.5.1-3.5.3; Pucin MSJ Resp. (Dkt. # 183) at 4-5 (citing Davenport Decl. (Dkt. # 174-1) ¶¶ 12-13).)

MSW denies Plaintiffs' allegations and contends that any harm Plaintiffs suffered is attributable to their own legal violations uncovered by Office of the Insurance Commissioner ("OIC") investigations.  (*See* MSW MSJ (Dkt. # 154) at 25-26.)  The OIC investigated Top Notch on September 5, 2014, and gave Top Notch an "Unacceptable" result, finding Top Notch out of compliance with four out of five compliance items.  (*See* 1st Bedard Decl. ¶ 6, Ex. D ("1st OIC Report") at 11, 21.)  The OIC investigated Top Notch again on February 5, 2015, concluded that Top Notch had corrected only one of the five compliance issues, and converted Plaintiffs' insurance producer licenses to

probationary licenses that required Top Notch "to have an appropriate accounting system with sufficient detail to track its financial transactions related to premium (sic) in place." (*See* 1st Bedard Decl. ¶ 7, Ex. E ("OIC Reinvestigation Report") at 23, 39; *id.* ¶ 9, Ex. G ("1st Consent Order") at 85.)  On April 28, 2017, the OIC issued an order finding that Plaintiffs violated the conditions of their probationary licenses and revoking Top Notch and Mr. Rashidi's licenses.  (*See id.* ¶ 12, Ex. J ("2nd Revocation Order") at 98.)   On October 2, 2017, the parties entered a second consent order in which the OIC rescinded the 2nd Revocation Order.  (*See id.* ¶ 13, Ex. K ("2nd Consent Order") at 108-09.)  In exchange, Mr. Rashidi and Top Notch voluntarily relinquished their licenses.  (*See id.*) Mr. Rashidi subsequently made a career change and began working in real estate.  (*See id.* ¶ 26, Ex. W ("Rashidi Dep.") at 84:23-85:15.)

Plaintiffs maintain two claims against MSW:  (1) defamation and (2) intentional interference with business expectancy.  (*See* FAC ¶ 4.3; 5/30/2018 Order (Dkt. # 86) at 1.)  Plaintiffs' sole claim against Pucin is for a Washington Consumer Protection Act ("CPA") violation based on noncompliance with Section 110 of the Washington Collection Agency Act ("WCAA").  (*See* FAC ¶¶ 4.4-4.5; 11/07/2017 Order (Dkt. # 38) at 14 (citing RCW 19.16.110).)

MSW moves to exclude Plaintiffs' expert witnesses, William Bradford and C. Frederick DeKay.  The court first examines the legal standard for motions to exclude expert testimony, then applies that standard to Dr. Bradford and Dr. DeKay.

//

//

# III.    ANALYSIS

## A.    Legal Standard for CFL's Motions to Exclude

Federal Rule of Evidence 702 governs the admission of expert testimony in federal court:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 requires that the expert be qualified and that the "'[e]xpert testimony . . . be both relevant and reliable.'"  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)).  Relevancy "simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'"  *Id.* (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).

Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'"  *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)) (internal citations and alterations omitted).  The Supreme Court suggests several factors that courts can use in determining reliability:  (1) whether a theory or technique can be tested; (2) whether it

has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993). The reliability inquiry is flexible, however, and trial judges have broad latitude to focus on the considerations relevant to a particular case. *See Kumho Tire*, 526 U.S. at 150.

In determining reliability, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, and the analytical connection between the data, the methodology, and the expert's conclusions. *See Estate of Barabin*, 740 F.3d at 463 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Cooper*, 510 F.3d at 942 ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). Moreover, "the proponent of the expert . . . has the burden of proving admissibility." *Cooper*, 510 F.3d at 942 (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

**B.  William Bradford**

Dr. Bradford was "asked by Counsel to express [h]is opinions as to the reasonableness of the business practices of Top Notch Inc. . . ." (2nd Bedard Decl. (Dkt. # 179) ¶ 4, Ex. B ("Bradford Report") at 30.) Dr. Bradford provides four principal

opinions in his less-than-three-page report:  (1) "[T]he communications related to a) the insurance contracts and b) the requirements and responsibilities of the client taxi/for hire companies with respect to insurance on there (sic) vehicles were appropriate from a business standpoint"; (2) "[T]he procedures for clients to remit payments were convenient for the clients"; (3) "[T]he use of QuickBooks was an acceptable and desirable practice for a small business such as Top Notch Inc."; and (4) "Top Notch, while not fully compliant [with OIC requirements], was moving toward full compliance." (*See id.* at 29-31.)

The court concludes that Dr. Bradford's opinions are not relevant and are unreliable.  Plaintiffs do not meet their burden to show that Dr. Bradford's opinions "'logically advance a material aspect of the party's case.'"  *See Estate of Barabin*, 740 F.3d at 463 (quoting *Cooper*, 510 F.3d at 942); *see also Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *8 (W.D. Wash. Aug. 5, 2013) (quoting *Daubert*, 509 U.S. at 592) ("Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, not helpful.").  Plaintiffs assert that Dr. Bradford "will assist the jury or judge when it comes to the appropriate measures of damages and/or damage reducing factors."  (Resp. at 6.)  However, Dr. Bradford does not opine on damages.  (*See generally* Bradford Report.)  Moreover, Dr. Bradford's opinions do not appear to "advance a material aspect" of plaintiffs' claims.  (*See id.*)  Plaintiffs maintain claims for defamation and intentional interference against MSW, and for a CPA violation against Pucin.  (*See* FAC ¶ 4.3, 4.4-4.5; 5/30/2018 Order at 1; 11/07/2017 Order at 14.) In contrast, the scope of Dr. Bradford's report is limited to Top Notch's internal business

practices and does not mention MSW, Pucin, or that Top Notch suffered damages.  (*See generally* Bradford Report.)

The court also finds Dr. Bradford's opinions unreliable because Dr. Bradford lacks experience in the insurance industry and does not explain his methodology.  Dr. Bradford testified at his deposition that he has no experience evaluating insurance agencies or brokers:

> Q. What experience do you have working with insurance agencies, if any?
> A. None.
> Q. And what experience do you have working with insurance brokers, if any?
> A. None.
> Q. What experience do you have assessing the reasonable business practices of an insurance agent and/or broker?
> A. None.
> Q. Prior to this case, have you ever assessed the reasonable business practices of an insurance agency or broker?
> A. No.
> Q. Okay. Have you ever determined the business viability of any insurance agency or broker prior to this case?
> A.  No.

(1st Bedard Decl. ¶ 6, Ex. D ("Bradford Dep.") at 35:3-25.)

Although Dr. Bradford's extensive experience in finance and economics qualifies him to provide expert testimony on those subjects, they are not within the scope of Dr. Bradford's opinions in this case.  (*See* Bradford Report at 26-28.)  Here, Dr. Bradford opines on the reasonableness of an insurance agency's practices, a topic on which he admittedly lacks experience.  (*See id.* at 29-31.)

Moreover, Dr. Bradford fails to explain his methodology apart from listing the documents he reviewed.  (*See id.*)  Absent this explanation, his report comprises a series of conclusions that lack support.  *See Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,

55 F. Supp. 2d 1024, 1034 (N.D. Cal. 1999) (citing *United States v. Rincon*, 28 F.3d 921, 914 (9th Cir. 1994)) (stating that "[i]f the testimony is not based on 'pre-litigation' research or if the expert's research has not been subjected to peer review, then the expert must explain precisely how he went about reaching his conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that he has followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field").

Some of Dr. Bradford's conclusions so directly contradict the record that they raise further questions about his unexplained methodology. For example, Dr. Bradford's report, dated March 14, 2019, concludes that "Top Notch, while not fully compliant [with OIC requirements], was moving toward full compliance." (*See* Bradford Report at 26.) Dr. Bradford cites to 2014 and 2015 reports from the OIC in support. (*See id.* at 31.) Yet, Dr. Bradford does not address that the 2015 OIC report, upon which he relies, states that Top Notch had corrected only one of the five compliance issues the OIC previously identified. (*See* OIC Reinvestigation Report at 39.) Nor does he address the OIC's conclusion that "[t]here was no documentation provided to the Examiner demonstrating that [Top Notch] was in process to correct the remaining compliance violations . . . ." (*See id.*) These contradictions in the record to Dr. Bradford's conclusions raise further concerns about the reliability his methodology.

Finding that Dr. Bradford's opinions are not relevant to this case and are unreliable, the court GRANTS MSW's motion to exclude Dr. Bradford's testimony.

## C.     Frederick DeKay

Dr. DeKay provides a "preliminary estimate of the economic loss to Mr. Robert Rashidi due to the effects of alleged interference and improper actions by defendants that damaged Mr. Rashidi's business, Top Notch Solutions, Inc." (*See* 2nd Bedard Decl. ¶ 3, Ex. A ("DeKay Report") at 2.) Dr. DeKay limits the scope of his analysis to "economic values," and defines Mr. Rashidi's economic loss as "the loss in compensation and benefits he would have been expected to earn over his worklife, had his business not been damaged, less mitigating compensation." (*See id.*) Dr. DeKay estimates that Mr. Rashidi would work until he was 63.96 "based on data reported in 'The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors,' Journal of Forensic Economics, vol. 22, no. 2, 2011," and on life expectancy data from the Department of Health and Human Services. (*See id.* at 2-3.)

Dr. DeKay extrapolates from Mr. Rashidi's average compensation in 2013-14, $95,576.00 per year, and concludes that "[i]n the absence of the improper actions that damaged his business, I assume that Mr. Rashidi would have continued to operate his business" and earn that amount "for the rest of his worklife expectancy." (*See id.* at 4.) Dr. DeKay calculates Mr. Rashidi's total lost earnings from January 1, 2015, to June 1, 2019, to be $423,171.00. (*See id.*) Dr. DeKay concludes the present value of Mr. Rashidi's lost earnings from June 1, 2019, to the end of his worklife expectancy to be $626,540.00, for total lost earnings of $1,048,932.00. (*See id.*) After accounting for Mr.

//

Rashidi's "[t]otal future mitigating earnings," Dr. DeKay concludes that Mr. Rashidi's "total economic loss is $670,727.00 . . . ."  (*See id.* at 6.)

MSW does not argue that Dr. DeKay's testimony is irrelevant.  (*See generally* Mot.)  Instead, MSW seeks to exclude Dr. DeKay's testimony as unreliable on six grounds:  (1) that Dr. DeKay's estimate of economic loss "assumes—based on information provided solely by Plaintiffs' counsel—that the decline in Top Notch's financial performance was solely caused by the wrongful acts of Defendants, without independently reaching his own conclusions" (*see id.* at 8), (2) that Dr. DeKay "cannot attribute Plaintiffs' economic loss to Defendants" (*see id.* at 10), (3) that Dr. DeKay's report provides speculation and does not constitute a business valuation (*see id.* at 12-13), (4) that Dr. DeKay "ignores the fact that Plaintiffs' insurance producer licenses were revoked" in calculating his projection of economic damages (*see id.* at 13-15), (5) that Dr. DeKay fails to incorporate an appropriate discount rate (*see id.* at 15-16), and (6) that Dr. DeKay's calculations are suspect because he "admitted during his deposition that the financial records provided to him by Plaintiffs were still incomplete" (*see id.* at 16).

The court concludes that Dr. DeKay's opinions are relevant and sufficiently reliable to present to the jury.  Dr. DeKay relies on data for Mr. Rashidi's past earnings with Top Notch to project his future earnings, a generally accepted method.  *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 809 (7th Cir. 2013) (finding that an expert "did not go amiss in basing [future earnings] on [the plaintiff's] actual earnings over a sustained period immediately preceding the interruption of the business and on the assessment of its managers as to its prospects going forward," and noting that "these are

the kinds of data that accountants normally rely on in calculating future earnings"). Dr.

DeKay also factors in projections for Mr. Rashidi's future income in real estate based on

average earnings for real estate agents in the Seattle area, and subtracts those "mitigating

earnings" from his future lost earnings projection. (*See* DeKay Report at 4.)

MSW's first two objections to Dr. DeKay's report misapprehend that Dr. DeKay

is a damages expert, not a causation expert. (*See* Mot. at 10.) The scope of Dr. DeKay's

analysis is "limited to economic values," a point Dr. DeKay reiterated at his deposition.

(*See* DeKay Report at 2; 2nd Bedard Decl. ¶ 5, Ex. C ("DeKay Dep.") at 33:21-23 ("I'm

not attributing these losses to any particular cause, I'm just identifying that they

occurred.").) MSW's objection that Dr. DeKay did not conduct a business valuation

similarly misses the mark. Dr. DeKay did not need to conduct a business valuation

because his report addresses Mr. Rashidi's earnings, not Top Notch's value. (*See* DeKay

Report at 2-7.)

MSW argues that Dr. DeKay should not have assumed that Mr. Rashidi would

continue to operate Top Notch past the date that the OIC revoked Plaintiffs' insurance

licenses. (*See* Mot. at 13-15.) However, as Dr. DeKay testified: "The question might be

had [Mr. Rashidi] not been interfered with or disparaged, would he have been able to

respond to the insurance commissioner's issues and correct those and avoid the

cancellation of his license." (*See* DeKay Dep. at 42:2-6.) Although any causal

connection between MSW or Pucin's allegedly tortious acts and Plaintiffs' OIC

noncompliance may be tenuous, it remains a fact question reserved for the jury and not

for the court on a *Daubert* motion. *See Papadopoulos v. Fred Meyer Stores, Inc.*, No.

C04-0102RSL, 2006 WL 3249198, at *1 (W.D. Wash. Nov. 8, 2006) ("The defects that defendant claims are embedded in plaintiffs' experts' assumptions raise issues of fact that are properly reserved for cross examination testimony presented to the jury.").  Dr. DeKay is entitled to opine on the damages Mr. Rashidi suffered should Plaintiffs prove that MSW's actions caused disruption sufficient to affect OIC compliance.  *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010) ("Requiring more precision than can be attained, especially where the impossibility of more precise ascertainment was the fault of the wrongdoer, would be inequitable and is not required . . . .").

MSW further argues that Dr. DeKay's use of a 0% net discount rate renders his opinions unreliable.  (*See* Mot. at 15.)  MSW relies on *Colleen v. United States*, 843 F.2d 329, 332 (9th Cir. 1987), in which the court rejected a magistrate judge's application of a net 0% discount rate because it was "unsupported by credible expert testimony."  (*See* Mot. at 15.)  *Colleen* noted that "a trial court may adopt a discount rate above 3% or below 1% if such a rate is '[s]upported by credible expert testimony.'"  *See Colleen*, 843 F.2d at 332 (citing *Trevino v. United States*, 804 F.2d 1512, 1519 (9th Cir. 1986)).  *Colleen* is inapposite because "credible expert testimony" supports Dr. DeKay's use of a 0% net discount rate.  Dr. DeKay relies on interest rate and inflation data from the Board of Governors of the Federal Reserve and the Bureau of Labor Statistics to calculate the net interest rate and devotes nearly a page of his report to explaining his calculations.  (*See* DeKay Report at 6.)  Whether Dr. DeKay should have relied on separate data to arrive at a different net discount rate is a subject for cross-examination, not a basis to exclude Dr. DeKay's testimony.  *See Atchley v. Pepperidge Farm, Inc.*, No.

CV-04-452-EFS, 2012 WL 12951707, at *3 (E.D. Wash. Oct. 25, 2012) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

MSW's reliance on *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 550-51 (1983) is also inapposite. (*See* Mot. at 15.) *Jones & Laughlin* merely stands for the proposition that it is unacceptable for a court to impose a mandatory 0% net discount rate. *See Jones & Laughlin*, 462 U.S. at 550-51 (overruling a Third Circuit holding that a 0% net discount rate was a "mandatory federal rule of decision"). Moreover, the United States Supreme Court specifically limited *Jones & Laughlin* "to suits under § 5(b) of the [Longshoremen's and Harbor Workers' Compensation Act]." *See id.* at 547.

Finally, MSW argues that Dr. DeKay's opinions are unreliable because "he had not been provided, among other documents requested, the full versions of Plaintiffs' 2010 and 2011 tax returns," and that some of Mr. Rashidi's tax returns may be "unreliable." (*See* Mot. at 16 (citing DeKay Dep. at 70:8-71:10).) However, MSW does not explain how these gaps in data negatively impact Dr. DeKay's methodology, especially given that Dr. DeKay based his estimate of Mr. Rashidi's future earnings losses on Mr. Rashidi's 2013-14 income. (*See generally id.*; DeKay Report at 5.) In any case, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Atchley*, 2012 WL 12951707, at *3 (quoting *Bazemore*, 478 U.S. at 400).

In sum, the court finds that Dr. DeKay possesses specialized knowledge that will assist the trier of fact, his "testimony is based on sufficient facts or data," his "testimony is the product of reliable principles and methods," and he "reliably applied the principles

and methods to the facts of the case." *See* Fed. R. Civ. P. 702(a)-(d).  Accordingly, the court DENIES MSW's motion to exclude Dr. DeKay's testimony.

## IV.    CONCLUSION

The court GRANTS in part and DENIES in part MSW's motion to exclude Plaintiffs' expert witnesses (Dkt. # 78).  Specifically, the court grants MSW's motion to exclude Dr. Bradford's testimony, and denies MSW's motion to exclude Dr. DeKay's testimony.

Dated this 25th day of September, 2019.

JAMES L. ROBART
United States District Judge